*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JULIE ROSS and GERALD ROSS,
*Appellees,*

*v.*

DENIELLE KRACHT and STEVEN KRACHT,
*Appellants.*

No. 20230389
Heard January 30, 2026
Filed July 30, 2026*

On Certification from the Court of Appeals

Eighth District Court, Duchesne County
The Honorable Samuel P. Chiara
No. 224000068

Attorneys:

Taylor P. Webb, Erin B. Hull, Salt Lake City, for appellees

Emily Adams, Allison Herr, Bountiful, for appellant
Denielle Kracht

Alexandra Mareschal, Jason B. Richards, Salt Lake City,
for appellant Steven Kracht

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which JUSTICE PETERSEN, JUSTICE NIELSEN, and JUDGE LUTHY joined.

ASSOCIATE CHIEF JUSTICE POHLMAN authored an opinion
concurring in part, dissenting in part, and concurring
in judgment.

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

JUSTICE HAGEN stepped down from the court before this case was decided. COURT OF APPEALS JUDGE JOHN D. LUTHY, having reviewed the briefs and listened to a recording of the oral argument, substituted for JUSTICE HAGEN and participated fully in this decision.

JUSTICE JORGENSEN and JUSTICE DENT became members of the Court after oral argument in this matter and did not participate.

---

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1   Under the Termination and Restoration of Parental Rights Act (the Termination Act), termination of parental rights must be strictly necessary to promote the child's best interest.[1] In this case, we are asked to decide whether this strictly necessary analysis also applies to the termination of parental rights under the Utah Adoption Act (the Adoption Act).[2] Upon review of the plain language of the termination provision, in conjunction with the distinct but harmonious purposes of the Adoption and Termination Acts, we conclude that it does.

¶2   Here, upon the petition of Julie and Gerald Ross (Grandparents) to adopt their grandchildren, R.K. and J.K., the district court terminated the parental rights of Denielle and Steven Kracht (Mother and Father, and collectively, Parents) without finding that termination was strictly necessary to promote the best interest of the children. Although the court erred in failing to apply the strictly necessary analysis, that error was harmless based on our

---

[1] UTAH CODE § 80-4-301(1). While the 2013 version of the Utah Code applies and the legislature has made subsequent changes to this section, no substantive changes are applicable here, nor do any of the non-substantive changes impact our analysis. We therefore cite the current version of the code in this opinion for convenience and clarity.

[2] *Id.* § 81-13-205(5)(e). The legislature has renumbered and made subsequent changes to the Adoption Act since 2023. Again, because no substantive changes are applicable here and none of the non-substantive changes impact our analysis, we cite the current version of the code in this opinion for convenience and clarity.

review of the court's order and the record before us. We therefore affirm.

## BACKGROUND

¶3    Denielle and Steven Kracht are the biological parents of the two children. They married in 2010 and subsequently had R.K. and J.K. in 2013 and 2014, respectively. Except for the period after Grandparents gained full-time custody of the children in July 2020, the children's lives have been marked by instability and danger at the hands of Parents.

¶4    Throughout the lives of the children, Mother and Father have been together off and on. When together, their relationship has been tumultuous. On one occasion, in an altercation with Mother, Father threw a car seat with R.K. in it across a yard. R.K. was three weeks old at the time. On another occasion, Father pointed a handgun at Mother and R.K. before firing the gun into an adjacent wall.

¶5    Also, throughout this time, Parents struggled with substance abuse, including alcohol and methamphetamines. This use directly impacted the children. On one occasion when Mother and Father were separated, Mother allowed Father to watch the children while she was away. She came home to find the children holding hypodermic needles, which she determined Father had used to inject illegal substances.

¶6    On another occasion, in January 2017, Grandparents gained temporary custody of the children, who at the time had been living with Mother. Grandparents noticed that the children appeared restless, uncomfortable, and unwell. The children were drug tested and both tested positive for methamphetamines and amphetamines. After obtaining a protective order on behalf of both children against Mother, Grandparents were awarded custody of the children for 150 days.

¶7    In March 2018, Grandparents filed a petition for permanent custody of the children. Later, in June 2019, Mother reached an agreement with Grandparents allowing her custody of the children provided she submitted to regular drug testing. But after signing the agreement, Mother and a new boyfriend took the children to Arizona with no notice to Grandparents. Shortly after arriving in Arizona, the new relationship ended and Mother took the children to Grand Junction, Colorado. She never complied with the drug testing requirement.

¶8   In February 2020, Father, who had not had significant contact with the children since 2015, convinced Mother to allow the children to have an overnight visit at his mother's house in the Grand Junction area. During the middle of the night, Father took the children to a friend's house in Idaho against Mother's wishes. A dispute between Mother and Father led to law enforcement involvement. But while law enforcement tried to determine custody, Father took the children and moved into a friend's house in Idaho. Mother took no formal legal action to get the children back.

¶9   After getting kicked out of the Idaho house, Father took the children to Washington briefly and then to a friend's house in Meeker, Colorado. After only a few weeks in Meeker, Father was arrested.[3] Mother was contacted by Colorado child protective services (CPS) about taking custody of the children, but because she was actively using methamphetamine and could not pass a drug test, CPS contacted and arranged for Grandparents to take custody of the children in July 2020. The oldest child, R.K., has epilepsy. Before this brief stint with Father, R.K.'s symptoms were regulated. But upon his return to Grandparents, R.K. suffered seizures, indicating that Father had not treated R.K.'s condition.

¶10  Since July 2020, Grandparents have had full-time custody of the children. During this time, Mother and Father have had little to no contact with either child. Mother, living in Colorado and being unable to afford to travel to Utah, has only visited the children during Christmas 2020 and 2021. On top of the visits, Mother has called to check in on the children about once a month, sometimes twice. Father, on the other hand, has not seen or had substantial contact with either child since July 2020. While the district court, as a part of the proceedings below, granted Father parent-time with the children in 2022, he failed to show up for the first visit, canceled the second, and tested positive for methamphetamine before the third.

¶11  In June 2022, Grandparents filed a petition in district court to terminate Mother's and Father's parental rights and to adopt the children. On January 18, 2023, the district court held a one-day

---

[3] Between 2010 and the time the district court issued the termination order on March 31, 2023, Father was arrested twenty-three times, was convicted in four cases, and served a prison sentence.

bench trial, where Grandparents, Mother, and Father testified. The parties also requested that the district court rule on whether a strictly necessary analysis was required in this case. The court declined to do so, stating that it was "still mulling . . . over" whether its analysis would include a strictly necessary finding. In their written closing arguments, Mother and Father argued that the analysis applied, while Grandparents argued that it was not applicable in Adoption Act cases.

¶12 On March 31, 2023, the district court issued its written order terminating Mother's and Father's parental rights. In the order, the district court made extensive findings on Parents' struggles with substance abuse, failure to maintain stable housing and employment, and inability to care for the children. Specifically, the court found that both Mother and Father were "habitual users of illegal controlled substances" and that such use had both directly and indirectly harmed the children. In addition to finding that Parents' substance abuse had already threatened the children's physical health and safety, the court also found that it negatively affected the physical, emotional, financial, and educational necessities of the children.

¶13 The district court also made findings specific to each of the parties. As to Mother, the court found that her continued substance abuse and failure to protect the children from Father after "two incidents of life threatening behavior toward her child" exhibited "an inability to act as a reasonable parent" and an "unwilling[ness] to place the children's best interests ahead of her own impulses or desires." The court also made findings on Mother's failure to comply with her community corrections program at the time of the termination trial, observing that Mother had committed fourteen rule violations—including one for a positive drug test in October 2022.

¶14 As to Father, the court found that his ongoing substance abuse contributed to his endangerment of the children and to his prolonged absence from them as a result of incarceration. It also found that the only significant contact Father had with the children after 2015 "was when he essentially kidnapped them from [Mother]" in early 2020.

¶15 In contrast, the district court found that Grandparents provide the children with stability through their "long-term stable marriage, housing, and income." It observed that Grandparents have demonstrated "familial love and commitment to the children"

as well as an ability to protect the children from Parents. Accordingly, the court concluded that adoption by Grandparents would allow the children "to have the opportunity to enjoy a stable, permanent home in a familial setting."

¶16 Summarizing its findings, the court concluded that Parents were "derelict intellectually, socially, and morally," that they "constitute[d] a danger to the health and safety of the children," and that there was "no benefit and only potential danger in subjecting the children to further contact with either of them."

¶17 In its conclusions of law, the court held that statutory grounds for termination were present, concluding that Parents had abandoned and neglected the children, that Father had abused the children, that they both were unfit parents, and that they both had made only token efforts to prevent neglect and serious harm to the children and to avoid being unfit parents.[4] The court then concluded that it was in the best interest of the children to terminate Mother's and Father's parental rights. But nowhere in the district court's order did it mention the strictly necessary analysis. Nor did the district court consider any reasonable alternatives short of termination.

¶18 Parents appealed. And the court of appeals certified the case to us to determine whether the termination of parental rights under the Adoption Act requires a strictly necessary analysis. Having determined in *Ross v. Kracht*, 2025 UT 22, 589 P.3d 687, that the termination order here is immediately appealable, we now consider Parents' challenge to the termination order.

## ISSUES AND STANDARDS OF REVIEW

¶19 Parents do not challenge the district court's determination that statutory grounds for termination exist here.[5] Instead, we are asked to decide whether a termination of parental rights under Utah Code subsection 81-13-205(5)(e) of the Adoption Act requires a strictly necessary analysis. If so, we must decide whether the district court committed reversible error when it terminated Mother's and Father's parental rights without conducting the required analysis. We review questions of statutory interpretation

---

[4] *See* UTAH CODE § 80-4-301(1).

[5] *See generally id.* § 80-4-301(1)(a)–(j).

for correctness.[6] And we will not reverse a termination order for error if the error is ultimately harmless.[7]

## ANALYSIS

¶20 At the outset, we recognize that the dissent would not reach whether the strictly necessary analysis applies to the termination of parental rights under Utah Code subsection 81-13-205(5)(e) of the Adoption Act (the Adoption Act's Termination Provision) because we ultimately conclude that the district court's failure to do such analysis here is harmless. But we have not hesitated in the past to resolve preserved, fully briefed, and squarely presented issues even if we ultimately determine that the error identified as a result of resolving the primary issue was harmless.[8] We choose that course here, particularly where our doing so allows us to resolve an open question of law that has been identified but has evaded resolution.[9] We therefore begin our analysis by deciding that issue.

¶21 Parents advance several arguments in support of their assertion that a strictly necessary analysis is required to terminate parental rights under the Adoption Act's Termination Provision. Most persuasively, Parents argue that the Adoption Act's reference to the grounds statute in the Termination Act incorporates the strictly necessary requirement. We agree.

¶22 We begin our analysis with the plain language of the Adoption Act's Termination Provision and conclude that it incorporates the strictly necessary requirement. We then turn to the district court's termination order in this case. While we agree with Parents that the district court erred in failing to apply a strictly necessary analysis, we conclude that the error was harmless.

---

[6] *In re Adoption of M.A.*, 2024 UT 6, ¶ 10, 545 P.3d 241.

[7] *See State ex rel. W.A.*, 2002 UT 127, ¶ 36 n.11, 63 P.3d 607; *In re L.B.*, 2015 UT App 21, ¶ 6, 343 P.3d 332.

[8] *See, e.g.*, *State v. Richins*, 2025 UT 10, ¶¶ 53–56, 568 P.3d 1046; *Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶¶ 56–64, 435 P.3d 179; *State v. Reece*, 2015 UT 45, ¶ 21, 349 P.3d 712.

[9] *See In re L.L.B.*, 2023 UT App 66, ¶¶ 17–18, 532 P.3d 592; *In re Adoption of J.E.*, 2024 UT App 34, ¶ 11 n.3, 546 P.3d 972.

I.    TERMINATION OF PARENTAL RIGHTS UNDER THE ADOPTION ACT REQUIRES THAT A STRICTLY NECESSARY ANALYSIS BE CONDUCTED

¶23   When interpreting a statute, we strive "to ascertain the intent of the legislature."[10] And because the best evidence of legislative intent is the plain language of the statute, "we analyze that first."[11] "In doing so, we read the plain language of the statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters."[12]

¶24   The Adoption Act's Termination Provision provides, in relevant part, that the court can terminate the parental rights of an individual if "the individual's parental rights are terminated *on grounds described in* Title 80, Chapter 4, Termination and Restoration of Parental Rights, and termination is in the best interests of the minor child."[13]

¶25   The only section in Title 80, Chapter 4—the Termination Act—that describes grounds is section 80-4-301, where ten grounds for the termination of parental rights are listed.[14] But, importantly, those grounds are preceded by this qualifying language:

> Subject to the protections and requirements of Section 80-4-104, and if, based on the totality of the circumstances, the juvenile court finds termination of parental rights, from the child's point of view, *is strictly necessary to promote the child's best interest*, the juvenile court may terminate all parental rights with respect to the parent if the juvenile court finds . . . .[15]

¶26   Parents argue that because the grounds for termination in section 80-4-301 are explicitly subject to the strictly necessary analysis, the Adoption Act's Termination Provision incorporates the same requirement through its reference to those same grounds. They also note that the qualifying language at the outset of section 80-4-301 refers to section 80-4-104, which restates the same

---

[10] *Castro v. Lemus*, 2019 UT 71, ¶ 17, 456 P.3d 750 (cleaned up).

[11] *Id.*

[12] *Id.* (cleaned up).

[13] UTAH CODE § 81-13-205(5)(e) (emphasis added).

[14] *Id.* § 80-4-301(1)(a)–(j).

[15] *Id.* § 80-4-301(1) (emphasis added).

requirement that termination be "strictly necessary to promote the child's best interest."[16]

¶27 Grandparents, for their part, argue that the plain language of the Adoption Act's Termination Provision does not incorporate the strictly necessary requirement. In their view, the Adoption Act's reference to the "grounds described in" the Termination Act merely incorporates the grounds themselves, divorced from the qualifying language preceding them. They support this argument by pointing to the Adoption Act's Termination Provision's own requirement that termination be "in the best interests of the minor child."[17] To conclude that the strictly necessary analysis applies, according to Grandparents, would render the Adoption Act's Termination Provision's reference to the best interests of the child superfluous.

¶28 Although it is true that the Adoption Act's Termination Provision does not contain the words "strictly necessary," we agree with Parents that its reference to the "grounds *described* in"[18] the Termination Act is best read as incorporating the strictly necessary requirement. While this reference could be argued to mean only that the enumerated grounds themselves are incorporated, we find this inconsistent with the plain language of the statute. As a part of our plain language analysis, "[w]e presume that the legislature was deliberate in its choice of words and used each term . . . in accordance with its ordinary meaning."[19] By using a broad transitive verb like "described," the Adoption Act's Termination Provision's reference to the grounds statute does not signal a narrow cross-reference to the grounds alone. Indeed, a "description" most naturally encompasses not just the enumerated ground itself, but the conditions and limitations that define when it applies. Reading "described in" to exclude the language that qualifies the grounds would result in an unnatural and strained construction. We therefore read the Adoption Act's Termination Provision's reference to the "grounds described in" the Termination Act to incorporate the grounds together with the

---

[16] *Id.* § 80-4-104(12)(b).

[17] *Id.* § 81-13-205(5)(e).

[18] *Id.* (emphasis added).

[19] *2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 31, 345 P.3d 675 (cleaned up).

qualifying language that precedes them—including the strictly necessary requirement.

¶29 This interpretation is further reinforced by reading the Adoption Act's Termination Provision together with the Termination Act's grounds statute. As a part of our plain language analysis, we interpret statutes "in harmony with other statutes in the same chapter and related chapters."[20] Here, the Adoption Act and the Termination Act are clearly related given that the Adoption Act's Termination Provision concerns the termination of parental rights and explicitly refers to "Title 80, Chapter 4, Termination and Restoration of Parental Rights."[21] Thus, a closer examination of the interaction between both statutes helps illuminate why the strictly necessary requirement applies to the termination of parental rights under the Adoption Act's Termination Provision.

¶30 In *In re Adoption of B.H.*, we discussed the differences between termination proceedings initiated under both acts.[22] There, we were asked, in part, whether a termination petition brought under the Adoption Act was a proceeding under the Adoption Act or Termination Act.[23] The father argued that the case arose under the Termination Act because of the Adoption Act's Termination Provision's reference to the grounds statute. We rejected that argument, concluding that "[t]he Adoption Act's cross-reference to the grounds for termination found in the other act [did] not mean that a contested termination brought under the Adoption Act actually [arose] under the [Termination Act]."[24] Importantly, however, we clarified that although the cross-reference did not bring the "proceeding outside of the Adoption Act," it did mean "that the same *considerations* apply whenever a termination is sought, whether or not it is in connection with an adoption."[25]

---

[20] *In re Adoption of M.A.*, 2024 UT 6, ¶ 14, 545 P.3d 241 (cleaned up).

[21] UTAH CODE § 81-13-205(5)(e).

[22] 2020 UT 64, ¶¶ 33–46, 474 P.3d 981.

[23] *Id.* ¶ 31.

[24] *Id.* ¶ 48.

[25] *See id.* (emphasis added).

¶31 The same considerations that apply in the Termination Act's grounds statute, including the strictly necessary requirement, apply to terminations under the Adoption Act's Termination Provision. And for good reason. In connection with an adoption of a child, the Adoption Act provides a district court with the jurisdiction to terminate a person's parental rights in five different scenarios: where the person (1) consents or voluntarily relinquishes his or her parental rights; (2) fails to intervene in the adoption proceeding; (3) is an unmarried biological father with unperfected parental rights; (4) is found by the court to not be the parent; or (5) the person's rights are terminated "on grounds described in" the Termination Act.[26] In only one of those scenarios, the one at issue in this case, number five, is a person with a perfected parental right contesting the adoption.[27] And it is only that scenario in which the legislature cross-references the requirements of the Termination Act. This is because a parent whose parental rights are threatened under the Adoption Act's Termination Provision is largely in the same shoes as a parent threatened with the same under the Termination Act. Under both acts, termination proceedings can be initiated by a private party.[28] And in both proceedings, the nature of the parent's interest in the child is the same. And that interest is weighty. Indeed, as our legislature aptly observed, "[u]nder both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child."[29]

¶32 As noted above, Grandparents disagree with this interpretation, arguing, in part, that the incorporation of the strictly

---

[26] UTAH CODE § 81-13-205(5)(a)–(e); *see also In re Adoption of B.H.*, 2020 UT 64, ¶ 37 (describing the scenarios in which a court can terminate parental rights under the Adoption Act).

[27] *See* UTAH CODE § 81-13-205(5)(e); *In re Adoption of B.H.*, 2020 UT 64, ¶ 37 ("[I]f a person whose consent is required contests the adoption, the Act provides a mechanism for determining whether the person's rights should be terminated.").

[28] UTAH CODE § 80-4-201(1), *id.* § 81-13-205(1); *see generally In re B.T.B.*, 2020 UT 60, 472 P.3d 827 (considering the termination of parental rights initiated by a private petition brought under the Termination Act).

[29] UTAH CODE § 80-4-104(1).

necessary requirement into the Adoption Act would render superfluous the Adoption Act's own requirement that termination be "in the best interests of the minor child."[30] Although "[w]e often presume that each term of a statute has independent meaning," through our preference to give effect to every word of the statute and avoid superfluity, "that is only a presumption."[31] And that presumption can give way "in circumstances where the terms of the statute suggest that the legislature was using a redundancy as a point of emphasis."[32] Both the Adoption Act and Termination Act reference the "best interests" of the child frequently.[33] Indeed, the best interests inquiry is child welfare's "polar star."[34] Accordingly, we view the reference to the best interests of the child in the Adoption Act's Termination Provision as "a point of emphasis."[35]

¶33 While Grandparents' interpretation could "preserve independent meaning" for the Adoption Act's reference to the best-

---

[30] *Id.* § 81-13-205(5)(e).

[31] *Meinhard v. State*, 2016 UT 12, ¶ 31 n.5, 371 P.3d 37; *see also Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465 ("Canons of construction . . . are not formulaic, dispositive indicators of statutory meaning. They are merely tools that guide our construction of statutes in accordance with common, ordinary usage and understanding of language . . . .").

[32] *Meinhard*, 2016 UT 12, ¶ 31 n.5; *see also Pugin v. Garland*, 599 U.S. 600, 609 (2023) ("[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication. As a result, the better overall reading of the statute sometimes contains some redundancy." (cleaned up)).

[33] The "best interest" of the child is the applicable standard for many of the determinations that district and juvenile courts make. *See* UTAH CODE §§ 81-13-104(2)(c); -202(1)–(2), (4)(a); -203(7)(b)(v)(C), (c); -207(11)(b); -210(3)(b)(iii); -215(2)(b)(iii), (4), (6)(b), (9); -216(3)–(4), (7)–(8); -219(6)(b); -220(4)(a)(v); *Id.* §§ 80-4-104(12), -105(2)(b)(ii); -106(3)(a)(i); -109(4)–(5); -203(3)(b)(i); -303(1)(b); -305(4)(c)(ii), (7)(b); -306(2)(b); -307(5)–(7); -402(1)–(3).

[34] *See In re J.P.*, 648 P.2d 1364, 1368 (Utah 1982) (cleaned up).

[35] *See Meinhard*, 2016 UT 12, ¶ 31 n.5.

interests inquiry, "it would also do substantial violence to the text and structure" of the Adoption Act when read in harmony with the Termination Act by subjecting similarly situated parents contesting adoption to two different termination standards depending on whether the petition to terminate parental rights is filed in juvenile or district court.[36]

¶34 Accordingly, under the plain language of the Adoption Act's Termination Provision and reading it in harmony with the Termination Act's grounds statute, we hold that the termination of parental rights under the Adoption Act's Termination Provision requires a strictly necessary analysis.

II. THE DISTRICT COURT'S FAILURE TO APPLY A STRICTLY NECESSARY ANALYSIS WAS HARMLESS

¶35 Having concluded that the strictly necessary analysis applies to terminations of parental rights under the Adoption Act's Termination Provision, we turn our attention to the district court's termination order here.

¶36 As our foregoing analysis establishes, before a district court can terminate a parent's rights under Utah Code subsection 81-13-205(5)(e), it must make two findings: (1) that there are one or more statutory grounds for termination; and (2) termination is strictly necessary to promote the child's best interests.[37] Parents do not challenge the district court's findings on the statutory grounds for termination. Instead, they argue that the court committed reversible error by not conducting the required strictly necessary analysis.

¶37 As a part of the strictly necessary analysis, a court must "explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights."[38] This is because "[i]f the child can be equally protected and benefited by an option other than termination, termination is not strictly

---

[36] *See Olsen*, 2011 UT 10, ¶ 20; UTAH CODE § 80-4-201(1); *id.* § 81-13-205(1).

[37] *See* UTAH CODE § 81-13-205(5)(e); *id.* § 80-4-301(1).

[38] *In re B.T.B.*, 2020 UT 60, ¶ 67, 472 P.3d 827 (cleaned up).

necessary."[39] Significantly, the court must make this finding on the record.[40]

¶38 Here, the district court's order terminating Mother's and Father's parental rights neither includes the words "strictly necessary" nor makes any specific findings as to why "other feasible options" short of termination, such as a temporary or permanent guardianship[41] in Grandparents' favor, could not "equally protect[]" the children.[42] The lack of such findings and the failure generally to conduct a strictly necessary analysis is error.[43] But Grandparents argue that such error is harmless given the record before us and the district court's extensive findings on the physical, emotional, and educational harms inflicted on the children by Parents. We agree.

¶39 An error is harmless when it "is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings."[44] Although the district court did not perform the strictly necessary analysis, including by making the requisite findings, we conclude that Parents have not shown that there was a reasonable likelihood of a different outcome had the correct analysis been applied.

¶40 As a part of its termination order, the district court made detailed findings on the harms Parents have inflicted on the children and the continued threat of harm should Parents maintain

---

[39] *Id.* ¶ 66.

[40] *Id.* ¶ 74 ("[The strictly necessary analysis] requires the court to find, on the record, that no other option can achieve the same welfare and best interest for the child.").

[41] Under such an arrangement, Parents would maintain "[r]esidual parental rights," including the "responsibility for support," "the right to consent to adoption," "the right to determine the [children's] religious affiliation," and "the right to reasonable parent-time." *See* UTAH CODE § 80-1-102(72)(a).

[42] *See In re B.T.B.*, 2020 UT 60, ¶¶ 66–67.

[43] *See In re J.A.L.*, 2022 UT 12, ¶¶ 23–25, 506 P.3d 606; *In re J.J.W.*, 2022 UT App 116, ¶ 37, 520 P.3d 38.

[44] *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943 (cleaned up); *State ex rel. W.A.*, 2002 UT 127, ¶ 36 n.11, 63 P.3d 607 (applying harmless error in review of an order terminating parental rights).

contact with the children. The court's ultimate conclusion that termination was in the best interest of the children was buttressed with factual findings that effectively precluded feasible alternatives—specifically, a permanent custody and guardianship arrangement. In the district court's weighing of the evidence as part of its best interest determination, it found that Parents "constitute[d] a danger to the health and safety of the children" and that there was "no benefit and only potential danger in subjecting the children to further contact with either of them." It further determined that it was in the children's best interest to be adopted by Grandparents based in part on its findings that they had provided and would continue to provide stability, love, and safety to the children.

¶41 Parents do not challenge any of the court's factual findings. Rather, they rely exclusively on their argument that the court failed to adequately consider alternatives short of termination as required by the strictly necessary analysis. But the court's factual findings are inconsistent with a conclusion that there was a reasonable likelihood the outcome would have been different had the court conducted the strictly necessary analysis.

¶42 Mother resists this conclusion and challenges Grandparents' view that she cannot keep the children safe by arguing that there is no evidence that she has affirmatively harmed them. Recognizing the district court's focus on her substance abuse, Mother argues that she is actively working on her sobriety and has had extended periods of sobriety in the past. She also argues that there is no evidence that continuing the status quo would harm the children—i.e., keeping the children in Grandparents' custody in a permanent guardianship arrangement.

¶43 But Mother's arguments ignore the findings of the district court. It found that Mother continues to struggle with substance abuse and that her insobriety has harmed and would continue to harm the children should her parental rights be maintained. That finding has not been challenged and is strongly supported by the record before us. Indeed, Mother has directly exposed the children to methamphetamines and amphetamines, leaving Grandparents to nurture them back to health. And when Mother had a custody agreement with Grandparents in 2019 predicated on routine drug tests, she refused to comply yet continued to maintain custody over the children until Father "essentially kidnapped" them in early 2020. Further undergirding the court's determination that Mother cannot keep the children safe is the finding that Mother exhibits an

inability or unwillingness to protect the children from Father. This is evidenced by Mother's failure to report two instances where Father endangered the life of one of the children—the seat-throwing and gun-discharging incidents—and failure to prevent the children from being "kidnapped" by Father.

¶44 Father, for his part, argues that a permanent custody and guardianship arrangement could serve the children just as well as termination. He argues that while his relationship with Grandparents has devolved recently, the record shows that he can cooperate with Grandparents in a permanent custody and guardianship arrangement.

¶45 But again, this argument ignores the district court's findings that effectively preclude such an arrangement. Father has directly endangered the life of the oldest child, R.K., twice—once by throwing R.K. across the yard in a car seat and another by firing a gun in R.K.'s presence. Father has allowed both children to play with hypodermic syringes likely used by him to ingest illegal substances. And when he had the opportunity to spend court-ordered parent-time with the children in 2022, he failed to show up for the first visit, cancelled the second, and tested positive for methamphetamines before the third. The district court found that since 2015, the only substantial contact Father has had with the children "was when he essentially kidnapped them from [Mother]" in early 2020 for three months.

¶46 Thus, given the record before us and the court's factual findings, there is no reasonable likelihood that Parents would have fared better if the court had applied the strictly necessary analysis. We therefore conclude that while the district court erred in not applying the required strictly necessary analysis, that error was harmless. We affirm the termination of Mother's and Father's parental rights.

## CONCLUSION

¶47 The termination of parental rights is a serious measure with constitutional import. Today we make clear that the termination of parental rights under Utah Code subsection 81-13-205(5)(e) to facilitate adoption is subject to the strictly necessary analysis. And while the district court here erred in not applying the strictly necessary analysis, we conclude that it was harmless error. We therefore affirm.

POHLMAN, A.C.J., concurring in part, dissenting in part,
and concurring in the judgment

ASSOCIATE CHIEF JUSTICE POHLMAN, concurring in part, dissenting in part, and concurring in judgment:

¶48 I fully concur with the majority's analysis in Part II of the opinion and join in the ultimate judgment in this appeal. But I do not join its analysis in Part I.

¶49 I appreciate that the court of appeals certified this case to us so that we could decide whether the termination of parental rights under the Adoption Act requires a strictly necessary analysis.[45] However, I wouldn't address that question in this appeal.

¶50 Our conclusion in this case that any error by the district court was harmless negates the need to interpret the meaning of "grounds" in Utah Code subsection 81-13-205(5)(e). Indeed, if we were to assume without deciding that subsection 81-13-205(5)(e) requires a strictly necessary determination, our analysis in Part II would not change.

¶51 Further, the legislature recently amended the Adoption Act.[46] Because those amendments could inform our analysis of subsection 81-13-205(5)(e),[47] I would reserve our interpretation of that subsection for a case where we need the analysis to resolve the appeal.

───────────

[45] *See supra* ¶ 18.

[46] Among other things, the legislature amended Utah Code subsection 81-13-202(1) in May 2026 to include a requirement that "[a] determination of a minor child's best interest shall be made in accordance with Sections 80-2a-201, 80-4-104, and any other section of this title consistent with those sections." *See* Child Welfare Changes, H.B. 372 § 16, 2026 Leg., Gen. Sess. (Utah 2026) (available at https://le.utah.gov/~2026/bills/static/HB0372.html) (effective May 6, 2026).

[47] *See Thompson v. State*, 2024 UT 27, ¶ 31, 554 P.3d 988 ("We do not interpret the plain meaning of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." (cleaned up)).